**APPENDIX A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Agreement (the "Agreement") between the United States Department of Justice (the "Department") and AGCO Corporation ("AGCO"), on behalf of itself and its wholly-owned subsidiaries, including AGCO Limited ("AGCO Ltd."), AGCO Danmark A/S ("AGCO Denmark"), and AGCO S.A. (collectively referred to as the "AGCO Subsidiaries"), and the parties hereby agree and stipulate that the following information is true and accurate. As set forth in Paragraph 4 of the Agreement, AGCO admits, accepts, and acknowledges that it is responsible for the acts of its officers, employees, agents, and those of the AGCO Subsidiaries, that are set forth below. Should the Department initiate the prosecution that is deferred by the Agreement, AGCO and the AGCO Subsidiaries agree that they will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.

If this matter were to proceed to trial, the United States would prove beyond a reasonable doubt, by admissible evidence, the facts set forth in this Statement of Facts and the Criminal Information being filed against AGCO Ltd. This evidence would establish the following:

**I.   The United Nations Oil-For-Food Program**

1.   On or about August 6, 1990, days after the Republic of Iraq's invasion of Kuwait, the United Nations ("U.N.") adopted Security Council Resolution 661, which prohibited U.N. member-states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies. Resolution 661 prohibited virtually all direct financial transactions with the government of Iraq.

1

2. On or about April 15, 1995, the U.N. adopted Security Council Resolution 986, which served as a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its oil. However, Resolution 986 required that the proceeds from oil sales be used by the Iraqi government to purchase humanitarian supplies, including but not limited to food, for the Iraqi people. Hence, this program became known as the Oil-for-Food Program. Payments made to the Iraqi government which were not approved by the U.N. and which were outside the strict contours of the Oil-for-Food Program were prohibited.

3. The rules of the Oil-for-Food Program required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas"). That escrow account funded the purchase of humanitarian goods by the Iraqi government.

4. Under the rules of the Oil-for-Food Program, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the government. Once that contract was finalized, the contract was submitted to a U.N. Committee ("the 661 Committee") which reviewed the contracts to ensure that their terms complied with all U.N., Oil-for-Food Program, and Iraqi sanction regulations. The 661 Committee accepted the contracts, rejected them or asked the supplier to provide additional information upon which the 661 Committee could make a decision.

5. If a contract was approved by the 661 Committee, a letter of credit was issued by BNP-Paribas to the supplier's bank stating that the supplier would be paid by the Oil-for-Food Program for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were deemed by

the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

6. On or about December 10, 1996, the first Iraqi oil exports under the Oil-for-Food Program began. The Oil-for-Food Program continued from in or about December 1996 until the United States invasion of Iraq on or about March 19, 2003. From in or about December 1996 through March 2003, the United States government prohibited United States companies and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the Oil-for-Food Program.

7. Beginning in approximately August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10 percent of the contract price, to the Iraqi government in order to be awarded a contract by the government. These kickbacks violated U.N. Oil-for-Food Program regulations and sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by the guidelines of the Oil-for-Food Program.

8. Often, these kickbacks were termed "after sales service fees" ("ASSFs"), but did not represent any actual service being performed by the supplier. These ASSFs were usually included in the contract price submitted by the supplier to the U.N. without the U.N. knowing that the contract contained an extra 10 percent which would be returned to the Iraqi government. Including the 10 percent in the contract price allowed the supplier to avoid paying the 10 percent out of its profits; instead, the suppliers caused the U.N., unknowingly, to fund the kickbacks to the Iraqi government.

9. Some suppliers labeled the ASSFs as such, thereby leading the U.N. to believe that actual after-sales services were being provided by the supplier. Other suppliers disguised

the ASSFs by inserting fictitious line items into the contracts for goods or services that were not being provided. Still other suppliers simply inflated their contract prices by 10 percent to account for the payments they would make, or cause to be made, to the Iraqi government.

## II. The AGCO Subsidiaries' Payment of Kickbacks Under the Oil-For-Food Program

### A. Relevant Entities and Individuals

10. AGCO Corporation was headquartered in Duluth, Georgia, and was a manufacturer and supplier of agricultural machinery and equipment. AGCO was publicly traded on the New York Stock Exchange. AGCO issued and maintained a class of publicly-traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, and was required to file periodic reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act, 15 U.S.C. § 78m. Accordingly, AGCO was an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1(a). By virtue of its status as an issuer within the meaning of the FCPA, AGCO was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of AGCO and its subsidiaries, including those of AGCO Ltd., AGCO Denmark, and AGCO S.A., the books, records and accounts of which were incorporated into the books, records, and accounts of AGCO.

11. AGCO Ltd., a wholly-owned subsidiary of AGCO, was a British corporation, headquartered in Coventry, England. AGCO Ltd. was responsible for AGCO's business operations in Europe, Africa, and the Middle East. During the Oil-for-Food Program, AGCO Ltd. marketed, directed, and assisted in the negotiations and sales of equipment to Iraq through AGCO S.A. and AGCO Denmark.

4

12. AGCO S.A., a wholly-owned subsidiary of AGCO, was a French corporation, headquartered in Beauvais, France. AGCO S.A. sold agricultural equipment and parts to Iraq during the Oil-for-Food Program at the direction and with the assistance of employees of AGCO Ltd.

13. AGCO Denmark, a wholly-owned subsidiary of AGCO, was a Danish company based in Copenhagen, Denmark. AGCO Denmark sold agricultural equipment and parts to Iraq during the Oil-for-Food Program at the direction and with the assistance of employees of AGCO Ltd.

14. Employee A, a British citizen, was employed by AGCO Ltd. as the Business Manager for the Middle East region.

15. Employee B, a British citizen, was employed by AGCO Ltd. as the Sales Director for the Middle East region.

16. Employee C, a British citizen, was employed by AGCO Ltd. as the Business Manager for spare parts.

17. Employee D, a British citizen, was employed by AGCO Ltd. as the Director of Exports and Business Development.

18. Employee E, a Danish citizen, was employed by AGCO Denmark as a Sales and Service Manager.

19. Agent Y was a Jordanian citizen and owner of a Jordanian company that acted as an agent and distributor for AGCO Ltd. in connection with sales made through the Oil-for-Food Program.

### B. AGCO's Presence in Iraq

20. Prior to the Oil-for-Food Program, AGCO's predecessor, Massey-Ferguson, sold vehicles, equipment, and parts in Iraq; however, after AGCO purchased Massey-Ferguson in 1994, AGCO's sales decreased due, in part, to the political instability in the region. Upon the creation of the Oil-for-Food Program, AGCO attempted to increase its business operations in Iraq. To assist with the marketing and sales within Iraq, AGCO Ltd. hired Agent Y.

21. AGCO Ltd. compensated Agent Y through the payment of commission fees, including: (a) a flat rate commission; (b) a variable commission based upon the value of the sales contract; and (c) an "After Sales" commission. The "After Sales" commission was intended to be used by Agent Y to support AGCO's equipment, by providing training to service personnel and providing repair and operator instructions on AGCO's equipment.

22. Agent Y's total commission payments, combined, were generally between 3 and 7 percent of the total contract price.

### C. The AGCO Subsidiaries' Kickback Scheme

23. From approximately 1997 to 2003, the AGCO Subsidiaries participated in the Oil-for-Food Program.

24. From in or about 2000 to March 2003, the Iraqi Ministry of Agriculture awarded the AGCO Subsidiaries sixteen (16) Oil-for-Food Program contracts for agricultural equipment and farm machinery. To obtain three of these contracts, the AGCO Subsidiaries paid approximately $553,173 kickbacks to the government of Iraq through Agent Y.

25. In late 2000, Agent Y informed Employee A, AGCO Ltd.'s business manager for the Middle East, that the Iraqi Ministry of Agriculture was demanding kickbacks.

26.   On or about December 7, 2000, Employee C sent an email to Employee A indicating that the Iraqi Ministry of Agriculture may seek up to 30 percent of the contract value as a condition of awarding contracts. Although the AGCO Subsidiaries did not pay the 30 percent originally referenced by Employee C, the AGCO Subsidiaries did agree to pay kickbacks to the Iraqi Ministry of Agriculture to secure at least three contracts.

27.   Beginning in early 2001, the AGCO Subsidiaries paid kickback payments to Agent Y, who then remitted the payments to the Iraqi Ministry of Agriculture.

28.   In order to generate the funds to pay the kickbacks to the Iraqi government, and to conceal the payments, the AGCO Subsidiaries secretly inflated the price of the contracts from 13 to 21 percent per contract before submitting them to the U.N. for approval. When the contracts were submitted to the U.N. for approval, AGCO and the AGCO Subsidiaries failed to disclose that they were paying kickbacks to the Iraqi government in direct contravention of the Oil-for-Food Program regulations.

29.   After the U.N. approved the contracts, BNP-Paribas issued letters of credit, via international wire communication, to the bank used by the AGCO Subsidiaries, in the amount of the contract price. These letters of credit authorized the AGCO Subsidiaries to be paid the amounts specified in the contracts, which included the kickbacks to be paid to the Iraqi government.

30.   In order to pay the kickbacks, the AGCO Subsidiaries increased the payments to Agent Y. Agent Y, in turn, used the excess funds to pay the kickbacks to the Iraqi government on behalf of the AGCO Subsidiaries.

31.   To conceal the kickback scheme, AGCO Ltd. employees created an account in AGCO Ltd.'s books and records labeled "Ministry Accrual." AGCO Ltd. Employees A, B, and

C described the purpose of the payments to the Ministry Accrual Account as money to be used to service equipment and parts in the future. Each of the kickback payments for the Iraqi government were placed into this separate account. Employees A, B, and C then directed that Agent Y be paid a standard commission, which included an "After Sales" service fee designed to provide service on equipment and parts. Agent Y's commission was deposited into a separate account. Thus, Employees A, B, and C authorized, instructed, and facilitated the payment of two fees ostensibly for after-sales services; one fee was paid directly to Agent Y and the other fee was a kickback to be paid by Agent Y to the Iraqi government.

### D. Contracts 800948, 801388, and 1100173

32. In general, employees from AGCO Ltd. and Agent Y negotiated the Oil-for-Food contracts with the Iraqi government officials. Once the contracts were negotiated, employees from AGCO S.A. and AGCO Denmark approved and executed the contracts.

#### 1. Contract 800948

33. On or about October 14, 2000, Employee A, an employee of AGCO Ltd., executed a contract on behalf of AGCO S.A., referenced by the U.N. as Contract 800948. The contract was for the sale of tractors and related spare parts. The contract was for €2,183,328, including an extra 14.05 percent to be used to pay a kickback to the Iraqi government.

34. On or about February 5, 2001, BNP-Paribas issued a letter of credit, via international wire communication, to BNP-Paribas, located in Paris, France, the bank used by AGCO S.A. This letter of credit authorized AGCO S.A. to be paid the amount in Contract 800948, which included the kickback to be paid to the Iraqi government.

35. On or about April 12, 2001, AGCO caused its products purchased pursuant to Contract 800948 to be delivered to Iraq, prompting a company based in Geneva, Switzerland,

that provided commercial inspection services on behalf of the U.N. in Iraq ("the inspection company") to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the products had been received and inspected upon entry into Iraq. This notification, in turn, triggered payment by the U.N. to AGCO for Contract 800948.

36. On our about June 2, 2001, Agent Y sent an email to Employee A providing a break down of the costs associated with the contract, noting that Contract 800948 included an "extra commission which you know" is a "third party expense" and the money is to be paid to the "Ministry."

### 2. Contract 801388

37. On or about October 30, 2000, Employee A, an employee of AGCO Ltd., executed a contract on behalf of AGCO S.A., referenced by the U.N. as Contract 801388. The contract was for the sale of tractors and related spare parts. The contract was for €10,933,000, including an extra 21 percent to be used to pay a kickback to the Iraqi government.

38. On or about December 7, 2000, Employee C sent an email to Employee A about Contracts 801388 and 800948, noting "as these contracts were negotiated and signed by your good self in Baghdad…you would of course have a better understanding of the commercials of these contracts, ie you mention [sic] up to 30% kick backs to the ministry etc."

39. This email was forwarded on or about the same day to Employees B and D.

40. On or about February 16, 2001, BNP-Paribas, located in New York, issued a letter of credit, via international wire communication, to BNP-Paribas, located in Paris, France. This letter of credit authorized AGCO S.A. to be paid the amount in Contract 801388, which included the kickback to be paid to the Iraqi government.

41.  Between on or about April 5, 2001, and June 30, 2001, AGCO caused its products purchased pursuant to Contract 801388 to be delivered to Iraq, prompting the inspection company to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the products had been received and inspected upon entry into Iraq. This notification, in turn, triggered payment by the U.N. to AGCO for Contract 801388.

### 3. Contract 110173

42.  On or about August 18, 2001, Employee E, on behalf of AGCO Denmark, but at the direction of AGCO Ltd., executed one contract, referenced by the U.N. as Contract 1100173. The contract was for the sale of a tractor and related spare parts. The contract was for €4,783,646 which included an extra 13.47 percent to be used to pay a kickback to the Iraqi government.

43.  On or about April 10, 2002, BNP-Paribas issued a letter of credit, via international wire communication, to Danske Bank A/S Copenhagen, the bank used by AGCO Denmark. This letter of credit authorized AGCO Denmark to be paid the amount in Contract 1100173, which included the kickback to be paid to the Iraqi government.

44.  Between on or about June 7, 2002, and June 14, 2002, AGCO caused its products purchased pursuant to Contract 1100173 to be delivered to Iraq, prompting the inspection company to send a facsimile from Iraq to the U.N. in New York notifying the U.N. that the products had been received and inspected upon entry into Iraq. This notification, in turn, triggered payment by the U.N. to AGCO for Contract 1100173.

### E. Total Kickback Payments

45. Between early 2001 and June 2002, AGCO caused Agent Y to pay the Iraqi government approximately $553,173 in kickbacks in connection with contracts 800948, 801388, and 1100173.

### III. AGCO's Books and Records

46. From in or about 2001 through in or about 2003, Employee A and others falsely characterized AGCO Ltd.'s kickback payments to the Iraqi government in AGCO Ltd.'s books, records and accounts as payments to Agent Y for "Ministry Accruals" to assist with after-sales service activities to support the maintenance of the equipment sold, even though AGCO Ltd. was aware that the Iraqi Ministry of Agriculture had provided no such services and the money was being passed on to the Iraqi government in exchange for being awarded contracts.

47. At the end of AGCO's fiscal years 2001, 2002, and 2003, the books, records and accounts of the AGCO Subsidiaries, including those of AGCO Ltd. containing false characterizations of the payments to the Iraqi government, were incorporated into the books, records and accounts of AGCO for purposes of preparing AGCO's year-end financial statements.

### IV. AGCO's Internal Controls

48. AGCO's legal department was aware that the company was conducting sales under the Oil-for-Food Program in Iraq, a sanctioned country, but failed to ensure that the contracts and agency agreements were reviewed prior to execution. Further, AGCO's legal department failed to review payment requests submitted to the United Nations in connection with AGCO's Oil-for-Food Contract.

49. AGCO Ltd.'s employees, including Employees A, B, and C, directed that a Ministry Accrual Account be created. The account was opened and maintained with little

oversight or review by AGCO's legal, finance, or compliance departments and was never audited by the company.

50.    AGCO Ltd.'s Finance Department approved the payments to the Ministry Accrual Account although there was no contractual basis for the payment of the additional commission amounts to the Ministry of Agriculture or Agent Y. Further, the Finance Department failed to take note or inquire as to the basis for the two separate commission payments to Agent Y, into two separate accounts. Finally, the Finance Department approved the payments without obtaining or reviewing any proof of service to support the payments.

51.    AGCO also did not conduct sufficient due diligence prior to engaging Agent Y.

## APPENDIX B

In order to address potential deficiencies in AGCO's internal controls, policies and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*, and other applicable anti-corruption laws, AGCO and its wholly-owned subsidiaries, including AGCO Limited ("AGCO Ltd."), AGCO Danmark A/S ("AGCO Denmark"), and AGCO S.A. (collectively referred to as the "AGCO Subsidiaries"), agree to continue to conduct, in a manner consistent with all of the obligations under this Agreement, appropriate reviews of existing internal controls, policies, and procedures.

Where necessary and appropriate, AGCO agrees to adopt new or modify existing internal controls, policies and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that AGCO makes and keeps fair and accurate books, records and accounts; and (b) a rigorous anti-corruption compliance code, standards and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but ought not be limited to, the following elements:

1. A clearly articulated corporate policy against violations of the FCPA and other applicable anti-corruption laws;

2. A system of financial and accounting procedures, including a system of internal accounting controls, designed to ensure the maintenance of fair and accurate books, records and accounts;

3. Promulgation of a compliance code, standards and procedures designed to reduce the prospect of violations of the FCPA, other applicable anti-corruption laws, and AGCO's compliance code. These standards and procedures should apply to all directors, officers, and

employees and, where necessary and appropriate, outside parties acting on behalf of AGCO in a foreign jurisdiction, including agents, consultants, representatives, distributors, teaming partners, and joint venture partners (collectively referred to as "agents and business partners").

4.      The assignment of one or more senior corporate officials of AGCO to the implementation and oversight of compliance with policies, standards and procedures regarding the FCPA and other applicable anti-corruption laws. Such corporate official(s) shall have the authority to report matters directly to the Audit Committee of the Board of Directors of AGCO.

5.      Mechanisms designed to ensure that AGCO's policies, standards and procedures regarding the FCPA and other applicable anti-corruption laws are effectively communicated to all directors, officers, employees and, where necessary and appropriate, agents and business partners. This should include: (a) periodic training for all directors and officers and, where necessary and appropriate, employees, agents and business partners; and (b) annual certifications with regard to this training by all directors and officers and, where necessary and appropriate, employees, agents and business partners.

6.      An effective system for reporting suspected criminal conduct and/or violations of the compliance policies, standards, and procedures regarding the FCPA and other applicable anti-corruption laws for directors, officers, employees, and, where necessary and appropriate, agents and business partners.

7.      Appropriate disciplinary procedures to address, among other things, violations of the FCPA, other applicable anti-corruption laws, and AGCO's compliance code, standards and procedures by AGCO's directors, officers, and employees.

8.      Appropriate due diligence requirements pertaining to the retention and oversight of agents and business partners.

9. Where necessary and appropriate, standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the FCPA and other applicable anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the FCPA and other applicable anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any violation of anti-corruption laws or breach of representations and undertakings related to such matters.

10. Periodic testing of the compliance system, policies, and procedures designed to evaluate their effectiveness in detecting and reducing violations of anti-corruption laws and AGCO's compliance code, policies, and procedures.